# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (SOUTHERN DIVISION)

MARY LYNN FEAKES,          *

          Plaintiff       *

         v.            *       Civil Case No. 8:23-2145-AAQ

WASHINGTON METROPOLITAN    *
AREA TRANSIT AUTHORITY,
                          *
         Defendant.
                          *

## MEMORANDUM OPINION AND ORDER

This is a case concerning a woman's fall in a parking garage. Plaintiff, Mary Lynn Feakes, brings suit against Defendant, Washington Metropolitan Area Transit Authority ("WMATA"), for negligence based on its failure to remedy a muddy area in its garage on which she slipped. Pending before the Court are Plaintiff's Motion for Partial Summary Judgment on the issue of liability, ECF No. 44, Defendant's Motion to Exclude the Testimony of Plaintiff's Expert, Raymond Stoner, ECF No. 45, and Defendant's Motion for Summary Judgment, ECF No. 46.

Defendant argues that the doctrine of sovereign immunity strips the Court of jurisdiction to hear Plaintiff's claim. Defendant is correct insofar as sovereign immunity prevents suit alleging the insufficiency of Defendant's cleaning and maintenance policies. However, the doctrine allows suit based on the narrow theory that Defendant failed to abide by its own mandatory policy. Accordingly, the Court has jurisdiction over a claim of negligence premised on this specific theory of liability.

For these reasons and the reasons discussed below, the Court will deny both Motions for Summary Judgment, because disputes of material fact persist as to each of the elements of

Plaintiff's negligence claim. Additionally, the Court shall deny Defendant's Motion to Exclude the testimony of Plaintiff's expert, in part, while specifying the scope of allowable testimony below.

## BACKGROUND

### I. Factual Background

### A.    Plaintiff's Accident & Injury

On the afternoon of June 11, 2021, Plaintiff drove to the Shady Grove Metro Station, where she parked in the South Garage.[1] ECF No. 44-3, at 17:12-18:10, 61:3. As she exited her vehicle and walked away, her "leg went out from under [her]" and she fell. *Id.* at 22:6-7. She soon noticed "mud everywhere," including on her person and effects. *Id.* at 24:13-17. After realizing "there was no way [she] could put weight on [her] foot," she called out to two nearby men for help. *Id.* at 26:7-12. The men summoned an Officer, who assisted Plaintiff in contacting emergency medical services ("EMS"). *Id.* at 26:12-22. While waiting for EMS to arrive, the Officer took photos of the area where Plaintiff slipped. *Id.* at 28:10-21; ECF Nos. 44-4, 44-5.[2] Both the photos and the Officer's body-worn camera footage depict a slick, muddy area. ECF Nos. 44-4, 44-5, 53.

EMS transported Plaintiff to a hospital via ambulance, where medical staff determined she had suffered a dislocated ankle. ECF No. 44-3, at 45:8-10, 49:10-12. She underwent surgery the next day, and was discharged two days after that. *Id.* at 50:4-12.

---

[1] In the record, the South Garage is sometimes referred to as the "Small Garage." ECF No. 44-1, at 3 n.1.

[2] Plaintiff includes two sets of photos in the record: one set taken by the Officer on the day of the incident, and another taken one or two months later. ECF No. 44-2 (Appendix of Exhibits). The photos at ECF No. 44-4 and ECF No. 44-5 were taken by the Officer at the time of the incident. ECF No. 44-1, at 3.

**B.      WMATA's Maintenance Procedures**

Defendant employs custodians to conduct upkeep of its parking garages at the Shady Grove

Metro Station.   At the time of the incident, WMATA had promulgated a cleaning schedule

detailing daily maintenance tasks for relevant employees between 6:00 A.M. and 2:30 P.M.   ECF

No. 50-1.   For example, from 1:35 P.M to 1:50 P.M., custodians were to "[s]weep & mop floors"

in elevators.   *Id.*   Defendant also enacted a weekly special project schedule assigning additional

tasks to be completed each day, including instructions to "remove[] any trash or m[ud] from drains

[on] all levels from both garages" each Friday.[3]   ECF No. 50-2.   Both schedules state they "must

be adhered to at all times unless changed by [a] supervisor on duty."   ECF No. 50-1; ECF No. 50-

2.

Custodian Donald Alexander was working at the Shady Grove Metro Station on the day of

the incident.   ECF No. 46-8, at 1.   At the time, he had two supervisors, Ana Cruz and Jerel Jones,

both of whom attended to multiple job sites; as a result, they were not always present at the Shady

Grove Station.   ECF No. 44-19, at 12:8-18; ECF No. 44-21, at 13:12-14, 14:7-12; ECF No. 44-22,

at 8:21-9:2, 11:1-7.   Mr. Alexander stated in his deposition that his duties included "pick[ing] up

trash, chang[ing] the trash . . . mop[ping] elevators, dust[ing] off call boxes, . . . and clean[ing]

windows."   ECF No. 44-19, at 9:4-8.   As for the drains, he recalled sweeping and cleaning them

to allow water to pass through, noting he "clean[ed] up . . . feces and urine and leaves and trash"

in the garage.   *Id.* at 24:1-7, 25:7-10; *see also id.* at 35:5-10 (explaining "the main issue" with

respect to the drains was "leaves").   In a sworn declaration, Mr. Alexander stated that both cleaning

schedules accurately reflect the tasks assigned to him as of the date of the accident.   ECF No. 46-8,

---

[3] The document required that "mood [be removed] from drains," but the parties seemingly agree
that this is a typographical error and the document is meant to refer to mud.  *See* ECF No. 44-1, at
5 n.3; ECF No. 44-21, at 39:2-3, 19.

at 2.  He affirmed that "during June 2021, [he] completed both [his] daily and weekly assigned tasks" and did not "recall deviating" from either schedule on the day in question.  *Id.*

## II. Procedural Background

Plaintiff filed the Complaint in the present case on April 26, 2023, in the Circuit Court for Montgomery County, Maryland, alleging Defendant's negligence in the maintenance of the garage.  ECF No. 1-6, at 1.  In August 2023, Defendant removed the case to this Court, ECF No. 1, and filed an answer denying liability, ECF No. 3.

The case proceeded to discovery.  In September 2024, Plaintiff raised a discovery dispute with the Court because Defendant had "not been cooperating" and "failed to provide" relevant documentation related to the South Garage.  ECF No. 30.  In particular, Defendant had produced "only one 'weekly' inspection report" which "d[id] not . . . relate to the subject [S]outh [G]arage," ECF No. 32, at 1, despite deposition testimony from Ms. Cruz, one of the site supervisors, that she maintained all of her inspection reports, ECF No. 44-21, at 9:20-10:5, took photos of issues raised during inspections on her work phone, *id.* at 47:12-17, and believed Mr. Jones may have kept additional reports, *id.* at 17:22-18:14.  Defendant denied Plaintiff's characterization of the discovery process.  ECF No. 31.  After a discovery conference on October 8, 2024, the Court ordered Defendant to "produce any remaining documents related to the South Garage . . . within 14 days."  ECF Nos. 36, 37.  Plaintiff took two additional depositions of corporate designees, seeking to ascertain further information regarding Defendant's record-keeping practices.  ECF No. 44-1, at 6-7.  Neither witness shared relevant information on this topic, and Defendant did not produce any additional documentation or reports.  *Id.* at 7-8.

On April 7, 2025, Plaintiff filed her Motion for Partial Summary Judgment, arguing that there is no dispute of material fact as to Defendant's liability.  ECF No. 44.  The same day,

Defendant filed a Cross-Motion for Summary Judgment, arguing that the Court lacks subject-matter jurisdiction over the case and, alternatively, the undisputed facts entitle it to judgment in its favor.  ECF No. 46.  Defendant also filed a Motion to Exclude the Testimony of Plaintiff's Expert, Raymond Stoner.  ECF No. 45.  Further, in her Reply, Plaintiff requested that the Court impose sanctions against Defendant for spoliation, due to its failure to provide inspection reports for the South Garage.  ECF No. 62, at 5-8.  Each Motion has been fully briefed, *see* ECF Nos. 54, 55, 56, 62, 63, 64, and a hearing is not necessary under this Court's Local Rules*, see* Loc. R. 105.6 (D. Md 2023).  Accordingly, the Motions are now ripe for decision.

## STANDARD OF REVIEW

The Court will grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue of material fact.  Fed. R. Civ. P. 56(a); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the nonmoving party. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).  "A party who bears the

burden of proof on a particular claim must factually support each element of his or her claim." *Scott v. United States*, No. PJM-06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007). Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *See Anderson*, 477 U.S. at 256–57.

**ANALYSIS**

The Court begins by analyzing whether sovereign immunity shields WMATA from liability, ultimately concluding that Plaintiff's claim may proceed under the narrow theory that Defendant's failure to abide by its own internal cleaning schedules constitutes negligence. The Court then addresses Defendant's Motion to Exclude Plaintiff's Expert, clarifying the acceptable boundaries of his testimony. As to liability, there are presently disputes of material fact that preclude summary judgment for either party. Finally, the Court declines to impose liability as a sanction, but reserves ruling on whether a less serious sanction may be appropriate.

## I.     Jurisdiction

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). Accordingly, when a federal court concludes that it lacks subject-matter jurisdiction, it must dismiss the aspects of the claim over which it lacks authority. *Smith v. WMATA*, 290 F.3d 201, 205 (4th Cir. 2002); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

Under the doctrine of sovereign immunity, "courts do not have jurisdiction to hear cases involving claims for money damages against the State, absent the State's consent to such suit."

*Tinsley v. WMATA*, 55 A.3d 663, 667 (Md. 2012); *Smith*, 290 F.3d at 205 ("To the extent the METRO's complained-of actions fall within its cloak of immunity, we lack subject matter jurisdiction over such claims."). "Given the unique attributes of sovereign immunity, [the Fourth Circuit] ha[s] held that the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)).

Although WMATA is not a state, it nonetheless enjoys limited sovereign immunity "as an interstate agency and instrumentality of" the three governments that created it: Maryland, Virginia, and the District of Columbia. *McFadden v. WMATA*, No. GLS-19-624, 2021 WL 11652624, at *3 (D. Md. May 24, 2021); *Tinsley*, 55 A.3d at 667 ("WMATA enjoys sovereign immunity as a result of" the three states "'confer[ring] their respective sovereign immunities on it'" (quoting *Morris v. WMATA*, 781 F.2d 218, 219 (D.C. Cir. 1986) (alterations in original)). Specifically, the interstate compact ("the Compact") that established WMATA

> provides that while WMATA "shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws)," it "shall not be liable for any torts occurring in the performance of a governmental function."

*Hendricks v. WMATA*, No. AAQ-18-2397, 2024 WL 327043, at *3 (D. Md. Jan. 29, 2024) (quoting Md. Code Ann., Transp. § 10-204(80)).

"To determine whether WMATA is entitled to sovereign immunity for an alleged tort, courts conduct a[n] . . . inquiry derived from analyses of the federal government's immunity under the Federal Tort Claims Act." *Id.* at *4. First, courts "consider whether the alleged tort was committed through the exercise of a 'quintessentially governmental' function . . . in which case

WMATA is immune from suit." *Id.* (quoting *Doe v. Wash. Metro. Area Transit Auth.*, 453 F. Supp. 3d 354, 363 (D.D.C. 2020)).   Cleaning practices "are easily distinguishable from 'quintessentially governmental' activities, such as police activity, prosecutorial decisions, or firefighting." *Pierce v. WMATA*, No. DKC091917, 2010 WL 4485826, at *4 (D. Md. Nov. 9, 2010) (internal citations omitted).

"If the conduct at issue is not quintessentially governmental," the Court proceeds to the next step; it considers "whether the alleged tort was committed through the exercise of a proprietary (or ministerial) function or a discretionary function." *Hendricks*, 2024 WL 327043, at *4.  "An act is proprietary if it entails 'enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required,' or if 'any statute, regulation, or policy specifically prescribes a course of conduct for an employee to follow' and does not allow for discretion." *Id.* (quoting *Doe*, 453 F. Supp. 3d at 363).  If such a directive exists, "the negligent failure to follow that course is not protected" by sovereign immunity.  *Smith*, 290 F.3d at 213 (Michael, M., concurring).

Finally, if a tort arises out of a non-proprietary—or in other words, discretionary— decision, the Court considers still one more question: whether WMATA's decision was "inherently . . . grounded" in "social, economic, or political" policy considerations.  *Smith*, 290 F.3d at 208 (first quoting *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993); and then quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)).  If it is rooted in such concerns, immunity applies; if not, the suit may proceed.

Plaintiff advances a claim of negligence premised on Defendant's insufficient maintenance of the parking garage, resulting in the unsafe, muddy surface on which she slipped.  ECF No. 44-1, at 9-11.  Plaintiff proposes two alternative theories, in this regard: 1) Defendant's insufficient

inspection and cleaning practices more generally; and 2) Defendant's failure to abide by its own internal cleaning policy, specifically its cleaning schedules. Sovereign immunity protects WMATA under the first theory; but the second theory may proceed. Plaintiff may not challenge the sufficiency of WMATA's cleaning rules, but may claim negligence on the basis of WMATA's alleged failure to comply with them.

### A. Defendant is Immune to Challenges to the Sufficiency of its Garage Maintenance Policies and Practices.

WMATA's sovereign immunity bars "challenges to the manner in which maintenance functions are carried out," unless such maintenance is conducted in a way that "violat[es] . . . a[] mandatory directive." *Tinsley*, 55 A.3d at 676-677; *see also Smith*, 290 F.3d at 211 (when "repair and maintenance would not involve an element of judgment or choice," then WMATA "would not be entitled to immunity." (internal quotation marks and citation omitted)). "[C]ourts regularly apply governmental immunity to reject claims arising from WMATA's design and maintenance policy decisions." *Lampkin v. WMATA*, No. TJS-19-2691, 2022 WL 1081949, at *4 (D. Md. Apr. 11, 2022) (collecting cases). For example, in *Tinsley*, the Maryland Supreme Court held that sovereign immunity barred two negligence claims in which plaintiffs fell in WMATA stations. 55 A.3d at 663. In the first case, the plaintiff alleged that WMATA's cleaning of the station floor had left it dangerously wet. *Id.* at 669. In the second case, the plaintiff alleged that the danger arose from snow that WMATA had failed to properly clear. *Id.* at 671. In both circumstances, the Court concluded that sovereign immunity applied, reasoning that the cases turned on economic and policy considerations reserved for WMATA. *Id.* at 677. The situations required WMATA to "balanc[e] concerns involved in creating a cleaning schedule against WMATA's budget," as well as "economic decisions related to the most efficient method for conducting maintenance operations." *Id. See also Bailbey v. WMATA*, No. CBD-15-1731, 2016 WL 1391820, at *6 (D.

Md. Apr. 8, 2016) ("WMATA's snow and/or ice removal decisions are based on economic and policy goals, and therefore are immune from suit.").

To the extent Plaintiff challenges the sufficiency of WMATA's maintenance policies governing the South Garage, sovereign immunity bars her claim.[4]  For example, Plaintiff cannot argue that Defendant should have swept the grates more frequently, or inspected the garage for mud each morning.  *See Robinson v. WMATA*, 858 F. Supp. 2d 33, 37-38 (D.D.C. 2012) (explaining sovereign immunity barred challenge to sufficiency of WMATA's standard operating procedures governing bus safety, but allowed challenge premised on failure to comply with mandatory requirements specified within them).  WMATA's decisions on these topics constitute determinations of "proper maintenance procedures" that are "grounded in concerns of economic and public policy[;]" thus, sovereign immunity shields them from review.  *Tinsley*, 55 A.3d at 677.

### B.    Defendant is Not Immune to Claims Arising Out of Its Failure to Comply with Its Cleaning Schedules.

Internal policies that "specifically prescribe[] a course of conduct for an employee to follow" create ministerial obligations, which are not immune from suit.  *Whiteru v. WMATA*, 258 F. Supp. 3d 175, 185-86 (D.D.C. 2017) (quoting *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151,

---

[4] Although Plaintiff states she "does not challenge WMATA's policy decision," only "its failure to adhere to its very own mandatory Cleaning Schedule and Weekly Assignments," the general thrust of her argument is broader than she claims.  ECF No. 55-1, at 9-10; *see also* ECF No. 44-1, at 10-11 (arguing Defendant's duty of care required it to "inspect and remove the mud and debris"), 11 (questioning whether "there really was an adequate inspection at any time before Metro opened the garage on the date of the incident"); ECF No. 62, at 4 (stating Defendant's "failure to inspect and remove the mud and debris in this case" constitutes breach of its duty of care); ECF No. 55-1, at 10-11 (same).  A more general focus predominates Plaintiff's expert report as well.  ECF No. 45-3, at 2-3 (expert stating his report examines the following questions: "whether the Defendant provided adequate/standard inspections," "whether the Defendant should have followed industry cleaning and maintenance standards," "whether the Defendant has a scheduled plan of preventative maintenance and cleaning which eliminates the drain clogs in a timely and reasonable manner," and "whether Defendant should have had procedures in place to" address the drain).

1159 (D.C. Cir. 2003)); *see also WMATA v. Barksdale Showell*, 965 A.2d 16, 20-21 (D.C. 2009). In contrast, if an act involves "an element of judgment or choice" and is "based upon considerations of public policy," it is discretionary. *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). The relevant inquiry occurs "at the *operational level*," meaning the Court must consider the discretion available to the employee that carries out the specified directive. *Hendricks*, 2024 WL 327043, at *4 (quoting *Doe*, 453 F. Supp. 3d at 363); *see also Whiteru*, 258 F. Supp. 3d at 185-86; *Barksdale-Showell*, 965 A.2d at 23.

Because Defendant's cleaning schedule set concrete, mandatory requirements for employees, Defendant's cleaning schedules create ministerial obligations. The first, daily cleaning schedule dictates how WMATA employees are to allocate their time between 6:00 A.M. and 2:30 P.M., Sunday through Saturday. ECF No. 50-1. The second schedule details "Weekly Special Project Assignments,"—specific tasks, one for each day of the week, that employees must complete each afternoon. ECF No. 50-2. Both documents state that the "schedule must be adhered to at all times unless changed by supervisor on duty." ECF No. 50-1, 50-2. Custodians are responsible for executing the required tasks, thereby implementing the policy at the operational level. *See* ECF No. 46-8, at 2. They lack discretion because they cannot change the order of operation absent input from a supervisor. *Whiteru*, 258 F. Supp. 3d at 186 (analyzing whether internal policies created a ministerial obligation for station managers conducting platform inspections by considering the discretion allowed to the employee physically carrying out the inspection); *Barksdale-Showell*, 965 A.2d at 23 (same). For example, each Friday, unless otherwise directed by the supervisor on duty, custodians must "[r]emove[] any trash . . . from all drains [on] all levels from both garages." ECF No. 50-2.

Defendant's argument that supervisors possess discretionary authority to alter the schedules is inapposite because supervisors are not at the relevant operational level. *See Whiteru*, 258 F. Supp. 3d at 186. The relevant analysis considers the choices available to the employee on the ground responsible for implementing the policy. *See, e.g. Barksdale-Showell*, 965 A.2d at 22-23; *Robinson*, 858 F. Supp. 2d 37-38 (analyzing ministerial duty in WMATA Standard Operating Procedures for bus drivers by examining available discretion to drivers in the field: "[T]his is not a case where the [WMATA's policies] have left these decisions up to [drivers]."). Defendant custodians are responsible for implementing the Shady Grove cleaning schedules as supervisors are not typically at the Station for the full day. ECF No. 44-19, at 9:4-8; ECF No. 44-21, at 13:9-14, 14:7-21; ECF No. 44-22, at 8:17-9:2, 15:16-21.

Defendant's unsupported assertions that its custodians necessarily deviated from the schedules are insufficient to find immunity applies. *Williams*, 929 F.3d at 176 (explaining that the party invoking immunity bears the burden of proof). In its Reply brief, Defendant argues that "[c]ustodial work, by its nature and as described by Mr. Alexander in his deposition, requires discretionary decision making." ECF No. 64, at 4. It further states that "[l]ogically, as a custodian, Mr. Alexander is required to address unexpected situations as they arise," and could accordingly deviate from the schedules. *Id.* The Court cannot consider these unsupported assertions because they do not satisfy Rule 56. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record"); *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 324 (4th Cir. 2017) ("The Federal Rules of Civil Procedure require parties to cite all evidence in support of their positions at summary judgment."). Mr. Alexander did not discuss deviation from the cleaning schedules either in his

deposition or sworn declaration.  To the contrary, in his declaration, he states he "do[es] not recall deviating" from the schedules on the day of the incident.  ECF No. 46-8, at 2.

Thus, at this stage of the proceedings, Defendant has not met its burden to invoke sovereign immunity as to a claim of negligence arising out of its failure to comply with its own internal cleaning schedule.[5]   The Court proceeds to analyze the remaining Motions in light of the narrowed version of Plaintiff's claim that remains.

## II.    Plaintiff's Expert Report

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) [their] . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 imposes on district courts the responsibility to act as gatekeepers of expert evidence, "ensur[ing] that an expert's testimony both rests on a reliable foundation and is

---

[5] "[I]f a regulation mandates particular conduct, and the employee obeys that direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of [that policy]." *United States v. Gaubert*, 499 U.S. 315, 324 (1991).  Accordingly, if Defendant adhered to the schedule on the day and week of the incident, WMATA would be immune to even this narrow challenge.  Presently, a dispute of material fact prevents the Court from definitively concluding whether immunity applies.  Although Mr. Alexander stated in his declaration that he completed his daily and weekly tasks during the relevant month, the photos of the grate from the day of the incident, as well as the Officer's body-worn camera footage, would allow a jury to conclude that Defendant did not clean the grate with the frequency its schedules require because of the muddy, slick conditions on the ground.  ECF No. 46-8, at 2; ECF No. 44-4; ECF No. 44-5, ECF No. 53.  Should it wish to do so, Defendant may renew its sovereign immunity defense at trial.  *Hendricks*, 2024 WL 327043, at *6.

relevant to the task at hand." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (emphasis omitted) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Nonetheless, "Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). District courts "'need not determine that the proffered expert testimony is irrefutable or certainly correct' because '[a]s with all other admissible evidence, expert testimony is subject to testing by [v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Peters-Martin v. Navistar Int'l Transp. Corp.*, 410 Fed. App'x 612, 618 (4th Cir. 2011) (alterations in original) (quoting *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006)). "[T]he rejection of expert testimony is the exception rather than the rule." *United States v. Parks*, 849 Fed. App'x 400, 403 (4th Cir. 2021) (quoting *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019)).

Plaintiff has retained Raymond Stoner as an expert witness on the topic of "management, operation, and safety practices of running a parking facility." ECF No. 45-8, at 2. Mr. Stoner's proposed testimony draws on decades of experience in the parking industry. ECF No. 45-8, at 5-7 (Mr. Stoner's curriculum vitae); ECF No. 46-11, at 3. During his career, he has managed large parking operations in public and private settings, including over three years as WMATA's Manager of Parking. ECF No. 45-8, at 5-7; ECF No. 46-11, at 3. In preparing his report, Mr. Stoner reviewed Plaintiff's deposition, as well as the depositions of Mr. Alexander and his supervisors. ECF No. 45-4, at 16:4-21. He also reviewed the responding Officer's body-worn camera footage, the photos that the Officer took on the day of the incident, and photos of the area taken after the incident. *Id.* at 16:22-17:11. He did not visit the site of the accident. *Id.* at 52:5-7.

14

Mr. Stoner's testimony must accord with the limited scope of the case that is not subject to sovereign immunity. Defendant argues that Mr. Stoner's testimony should be excluded because his methodology and underlying data are unreliable, and his opinion will not assist the trier of fact. The Court will permit Mr. Stoner to testify, but within the confines detailed below.

### A.    Mr. Stoner May Testify In Support of Plaintiff's Surviving Negligence Theory.

As explained above, Plaintiff's claim may proceed solely under the theory that Defendant failed to comply with its internal policy mandating weekly cleaning and inspection of the grates in the parking garage. Mr. Stoner's testimony must be similarly narrowed. At this stage, there are three relevant issues in Mr. Stoner's report: first, as to whether the exception to sovereign immunity applies, if the evidence suggests Defendant abided by its internal cleaning schedules; second, as to whether the failure to do so constituted a breach of duty, if industry standards require compliance with Defendant's cleaning schedules; and third, as to causation, whether the condition of the clogged drain could have caused Plaintiff's fall.

As to both the first and third issues, Mr. Stoner offers opinions as to what the drain's condition evidences regarding how often Defendant cleaned it and the danger that arose when it was not cleaned. Mr. Stoner opines that

> [T]he lower level of the Rockville Station parking facility is asphalt on grade with a series of floor drains on the level . . . there is clear evidence of the drain being clogged by debris blocking the grate. There is clear evidence that water is ponding because of the drains inability to flow properly to the storm drain system. There are clear water rings present at the location which indicate ponding of water. There is also evidence of dirt, dust, and debris build-up on this level of the garage. The area around the drain has an accumulation of wet silt which has created a slippery surface. There is evidence that the drain has not been maintained to acceptable standards and as a result, when the clogged drain fills with water the dust, dirt, and debris around the drain become extremely slippery when wet. This creates an extremely slippery surface of silt.

ECF No. 46-11, at 4-5. *See also id.* at 7 ("there is clear evidence that debris is clogging the drain and there is evidence of ponding from a clogged drain. There is also a presence of wet silt buildup which has created a slick muddy substance. It appears that the facility has not been cleared of debris on a regular basis."). Mr. Stoner expanded on such analysis in his deposition as well, noting that "the amount of silt . . . next to the drain where [Plaintiff] fell is . . . pretty excessive and is evidence of the drain and the silt and the mud around it not being cleaned up for quite some time." ECF No. 54-4, at 64:12-16. Such testimony is permissible, as it relates directly to Plaintiff's claim that WMATA was negligent in failing to abide by its own cleaning policies.

As to the second issue, Mr. Stoner may opine on whether Defendant's practices align with broader industry standards, as Plaintiff must establish that Defendant's failure to comply with its policy constituted a breach of the duty of the care.

However, he may not, for example, testify as to whether Defendant *should have abided* by "[i]ndustry standards outlined by National Associations" or treatises such as the National Parking Association's Parking Facility Maintenance Manual, as WMATA is immune to a challenge attacking the sufficiency of its policies. ECF No. 46-11, at 7.

**B.    Mr. Stoner's Opinions are Based on Sufficient Facts or Data and His Methodology is Reliable.**

Federal Rule of Evidence 702 requires that the opinions of expert witnesses be "based on sufficient facts or data" and be "the product of reliable principles and methods" which have been reliably applied "to the facts of the case." An expert may rely on "facts or data" that they have "been made aware of or personally observed." Fed. R. Evid. 703. An expert may also examine evidence that is not itself admissible if that evidence is "of a type reasonably relied on by experts in the particular field in forming opinions or inferences on the subject." *Tassi v. Holder*, 660 F.3d 710, 721 (4th Cir. 2011) (citing Fed. R. Evid. 703). Defendant attacks Mr. Stoner's methodology

as well as the factual basis for his conclusions. However, "questions regarding the factual underpinnings of the expert witness'[s] opinions affect the weight and credibility of the witness'[s] assessment, not its admissibility." *Mountain Valley Pipeline, LLC v. 9.89 Acres of Land*, 127 F.4th 437, 445 (4th Cir. 2025) (quoting *Bresler v. Wilmington Tr.*, 855 F.3d 178, 195 (4th Cir. 2017)).

Although Defendant argues that this case is similar to *Anderson v. Home Depot*, No. GJH-14-2615, 2017 WL 2189508 (D. Md. May 16, 2017), the circumstances here are distinguishable. ECF No. 45-1, at 4-8. The plaintiff in *Anderson* brought a negligence action against the defendant for injuries sustained after a metal bracket fell off a shelving unit and onto her head while she was shopping in defendant's store. *Anderson*, 2017 WL 2189508, at *1. The plaintiff retained a purported expert in "warehouse safety, industrial safety, [and] product display safety." *Id.* at *4. The expert's "'evaluation of the display' led him to several 'likely causes for this accident,'" all centering on Home Depot's failure to ensure the shelf was secure at the time of the incident. *Id.* In crafting his report, the witness "reviewed scene photos, the incident report, deposition transcripts" and other litigation documents, but did not visit the site of the accident or perform any tests. *Id.* Ultimately, the court excluded the expert's testimony because he failed to "explain how his experience form[ed] a sufficient basis for [his] conclusions." *Id.* at *5. Without any detail as to the basis for the expert's conclusions, the proposed testimony "amount[ed] to no more than speculation and 'the ipse dixit of the expert.'" *Id.* (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001)).

Mr. Stoner's proposed testimony differs from that of the proposed expert in *Anderson* because his report explains how he reached his conclusions. For example, he states that "[b]ased on [his] experience in the parking industry and after a review of the [relevant] area," the "presence of wet silt buildup" around the drain supports his conclusion that "the facility h[ad] not been

17

cleared of debris on a regular basis." ECF No. 54-3, at 7. He elaborated on this point in his

deposition, explaining how the photographs show evidence of "ponding":

> When—depending on the size of rain or rainstorms and the intensity of rain, a drain
> that does not . . . carry away the . . . stormwater the way it was intended and
> designed is usually the result of a clog. You can see that . . . there were some circles
> where there was evidence of water ponding because you could see where the silt
> buildup builds up at the end of the lip of the largest part of the last ponding. You
> can see that in the photos.

ECF No. 54-4, at 60:3-13. As opposed to relying on an ipse dixit conclusion—"a bare assertion

resting on the authority of an individual"—Mr. Stoner explains how he arrives at his conclusion.

*Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 n.4 (D. Md.

2011). Mr. Stoner's opinions thus differ from those presented in *Anderson*: they are not pure

speculation, but are grounded in a review of the facts at hand based on his experience in parking

operations.

Defendant further takes issue with Mr. Stoner's decision to not conduct a site visit. ECF

No. 45-1, at 6. Instead, Mr. Stoner relied on photographs, the body-worn camera footage, and the

depositions of relevant witnesses.[6] ECF No. 54-4, at 16:4-17:11. While a site visit may have been

beneficial, Mr. Stoner's failure to conduct a site visit does not automatically require exclusion. As

Mr. Stoner explained, a site visit "was not necessary" in this case because the photographs and

video depicted the conditions in the parking garage on the day of the incident, whereas a later site

---

[6] Defendant does not argue that Mr. Stoner's examination of the photographs, video, and
depositions was improper in and of itself. *See generally* ECF No. 45-1. Such materials plainly
fall within the range of materials an expert may rely on pursuant to Rule 703. Fed. R. Evid. 703;
*see also Jordan v. Fairmount Heights*, No. AAQ-22-2680, 2024 WL 732011, at *5 (D. Md. Feb.
21, 2024) (allowing an expert to testify despite opposing party's concern that "most of his
information came from publicly available news articles" because the "sources of an expert's
opinion affect the weight to be assigned [to] that opinion rather than its admissibility" (quoting
*Bresler v. Wilmington Tr. Co.*, Nos. PJM-09-2957, 2015 WL 1396265, at *3 (D. Md. Mar. 24,
2015) *aff'd* 855 F.3d 178, 202 (4th Cir. 2017)).

visit would reflect changed conditions—which are less relevant to this case. ECF No. 54-4, at 52:14-53:13 ("Me going out [to the site] would not have served a purpose. The condition would been – could have been different"). Defendant's argument concerns "the factual underpinnings of the expert witness'[s] opinions affect[ing] the weight and credibility of the witness'[s] assessment, not its admissibility." *Mountain Valley Pipeline, LLC*, 127 F.4th at 445 (quoting *Bresler*, 855 F.3d at 195).

The same is true of Defendant's attacks premised on Mr. Stoner's completion of his report in less than six hours, and his failure to test the grate at issue. ECF No. 45-1, at 5-6. To the extent Defendant wishes to attack Mr. Stoner's opinions on these lines, it may raise them on cross-examination. *Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, No. SAG-18-3298, 2021 WL 3883597, at *11 (D. Md. Aug. 12, 2021) (allowing expert to testify where opposing party "suggest[ed] that other documents and deposition testimony . . . contradict[ed] the materials that [the expert] relied upon" to develop expert's understanding of the facts, because such concerns could be addressed through "cross examination and presentation of . . . contrary evidence").

Finally, Defendant argues that the photos Mr. Stoner reviewed "do not reliably depict the conditions at the time of the incident" because "Mr. Stoner admit[ted] that he d[id] not know when the photos he reviewed were taken," and that in Plaintiff's deposition, she stated "all the grate photos were taken at least a month after the incident." ECF No. 45-1, at 6-7. This misstates the record. There are two relevant sets of photographs: one set taken by the Officer on the scene on the day of the incident, and a second taken approximately one month later. *See* ECF No. 44-2 (Appendix of Exhibits); ECF No. 44-3, at 28:10-21; 30:2-16. The photos at ECF No. 44-4 and ECF No. 44-5 were taken by the Officer at the time of the incident. ECF No. 44-1, at 3. During his deposition, Mr. Stoner stated he reviewed the photos from the day of the incident, as well as

the body-worn camera footage.  ECF No. 54-4, at 95:5-9 (explaining that he reviewed a set of photos taken at the time of the incident or "very shortly after"), 16:22-17:11 (stating he reviewed the video footage, and describing both sets of photos as among the materials he reviewed in crafting his report).  Accordingly, this argument, likewise, does not merit the preclusion of Mr. Stoner's testimony.

### C.    Mr. Stoner's Testimony May Be Useful to the Jury.

A court must allow expert testimony when the expert's "knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "Courts presume expert testimony to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror."  *Joaquim v. Buzzuro*, No. CDA 22 50, 2024 WL 3936925, at *10 (D. Md. Aug. 26, 2024); *see also id.* ("testimony about how difficult it is to lift heavy things is not 'helpful' and is thus excludable" (quoting *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990))).

Mr. Stoner's opinions may be useful to the jury because lay persons are generally unfamiliar with the manner and speed at which sediment builds up surrounding a grate in a parking garage; accordingly, his testimony may better allow the jury to assess whether Defendant adhered to its cleaning schedule.  For example, Mr. Stoner examined the photographs and videos from the day of the incident, concluding that "[t]he amount of silt . . . next to th[e] drain where [Plaintiff] fell is . . . pretty excessive and is evidence of the drain and the silt and the mud around it not being cleaned up for some time."  ECF No. 54-4, at 64:12-16; *see also id.* at 87:4-5 ("[I]n my experience it takes a while for that level of silt to buildup in a facility.").  In his deposition, Mr. Stoner explained the basis for this opinion: the silt buildup evidenced in the photos indicates water "ponding" around the drain.  *Id.* at 60:3-13.  When a drain is clogged, water "ponds out to a ring"

and "[t]he heaviest sediment will make a ring where the water ends its ponding mark for [a] particular rainstorm." *Id.* at 20:22-21:3. Mr. Stoner notes this circular pattern in the mud from the day of the incident. *Id.* at 20:20-21; 60:3-13; 71:3-6. Based on Mr. Stoner's experience, "[i]t takes a while for debris to . . . accumulate in the drain" to such an extent that "water [cannot] flow through," resulting in ponding. *Id.* at 87:4-5. Accordingly, he argues the pattern on the mud indicates a lack of regular, weekly cleaning. *Id.* at 64:4-16. Such insight is useful because "the subject matter is so particularly related to some science or profession that it is beyond the ken of the average layman." *Adams v. NVR Homes, Inc.*, 142 F. Supp. 2d 649, 654 (D. Md. 2001).

Contrary to Defendant's arguments, Plaintiff has not conceded that Mr. Stoner's testimony lacks specialized knowledge useful to a jury. ECF No. 63, at 1-3. In her Opposition to Defendant's Motion to Exclude Mr. Stoner's testimony, Plaintiff merely argued, in the alternative, that if the Court "preclude[d] Mr. Stoner from testifying," the case may continue absent expert testimony because "[j]urors will be able to rely on their common sense and life experience to determine whether a dangerous condition existed" in the garage. ECF No. 54-1, at 13.

## III.    Negligence

Under Maryland law "to assert a claim in negligence, the plaintiff must prove: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Neal v. United States*, 599 F. Supp. 3d 270, 290 (D. Md. 2022) (quoting *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 10 (2013)). "To establish negligence arising from a slip and fall caused by a dangerous condition on the premises, a customer must demonstrate either that the business 'created the dangerous condition' or that it 'had actual or constructive knowledge of its existence.'" *King v. WMATA*, No.

21

TDC-14-2752, 2016 WL 8716253, at *3 (D. Md. Feb. 26, 2016) (quoting *Rawls v. Hochschild, Kohn & Co.*, 113 A.2d 405, 408 (Md. 1955)). "Negligence is a relative concept and must be decided on the facts of each particular case; ordinarily, it is a question of fact to be determined by the jury." *Sullivan v. WMATA*, No. GLS-19-300, 2020 WL 917091, at *2 (D. Md. Feb. 26, 2020).

Both parties move for summary judgment on the issue of liability and disagree as to whether Defendant must abide by a heightened duty of care as a common carrier. *See* ECF No. 44-1; ECF No. 46-1; ECF No. 55-1; ECF No. 56-1; ECF No. 62; ECF No. 64. Additionally, WMATA argues in the alternative that it is undisputed that the muddy area in the garage was open and obvious, and as a result, it had no duty to alert Plaintiff to the danger or remedy the condition. ECF No. 46-1, at 12-13. The Court first explains the impact of its sovereign immunity ruling on the negligence analysis. Second, it assesses the relevant standard of care applicable to the case. Finally, it details the disputes of material fact as to liability that preclude it from entering summary judgment in either party's favor, regardless of the standard of care that applies.[7]

### A.    The Interplay Between Sovereign Immunity and the Standard of Care

The narrowing of Plaintiff's negligence claim due to sovereign immunity impacts the analysis of the claim. As previously explained, sovereign immunity allows for only one basis for liability: failure to adhere to WMATA's internal cleaning schedules. To succeed on this theory, Plaintiff must establish that Defendant's failure to abide by its cleaning schedule constituted a breach of the relevant standard of care. If, for example, the relevant standard of care did not require

---

[7] Defendant also argues that Plaintiff must introduce expert testimony in support of her claim. ECF No. 46-1 at 8-9. The Court need not address this argument because it has concluded, for the reasons explained in the previous section, that Plaintiff's expert may testify. Accordingly, this argument is moot.

compliance with the standard set in WMATA's schedule, Defendant's failure to comply with the schedule may not establish a breach of the relevant duty.

The U.S. District Court for the District of Columbia's decision in *Robinson v. WMATA*, 858 F. Supp. 2d 33 (D.D.C. 2012), illustrates how to analyze such a claim.  In *Robinson*, the court held that sovereign immunity barred suit against WMATA for its policy allowing bus drivers to drive while passengers are standing, but allowed the suit to proceed to the extent Plaintiff challenged the bus driver's failure to follow WMATA's internal directives requiring him to "check that passengers are secure and prepared for vehicle movement," and to "start gradually, stop smoothly, and turn slowly."  *Id.* at 38-39.  The court explained that "WMATA's internal guidance . . . without more, [is] insufficient to establish a national standard of care."  *Id.* at 40.  The case could proceed, however, because Plaintiff's expert explained that WMATA's policies "reflect the industry standard for similar transit agencies" as opposed to "a higher, more demanding one." *Id.* at 41 (quoting *Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839, 848 (D.C. Cir. 2007)).  *See also Whiteru v. WMATA*, 258 F. Supp. 3d 175, 189-90 (D.D.C. 2017) (holding that although sovereign immunity did not bar liability premised on WMATA's failure to conduct a reasonable investigation of the train platform as required by its Standard Operating Procedures (SSOPs), plaintiff nonetheless needed to separately establish that WMATA's policy accords with the standard of care.").

Plaintiff sufficiently raises disputes of material facts as to whether WMATA's failure to comply with its cleaning schedule breached the relevant standard of care.  Like the expert in *Robinson*, Mr. Stoner's testimony suggests WMATA's cleaning schedules were in line with the industry standard; he notes "[m]ost checklists in a garage check drains once a week."  ECF No. 54-4, at 64:20-21.  *See also* ECF No. 50-2 (WMATA schedule requiring employees to

"[r]emove[] any trash or m[ud] from drains on all levels from both garages" every Friday). Additionally, Mr. Stoner's opines on the appropriate standard of care, drawing from decades of experiences as well as industry manuals and guidelines to suggest a duty to clean drains of "debris on a regular basis."  ECF No. 54-3, at 5-7; *see Whiteru*, 258 F. Supp. 3d at 189-90 (finding plaintiffs "proffered evidence to establish a standard of care" where plaintiff's expert, based on his own experience and training, opined as to what a reasonable inspection would have included).  He also points to the National Parking Association's Parking Facility Maintenance Manual, which states "[a]ll parking floor areas, including curbs, should be swept at least monthly, though once per week is ideal."  ECF No. 54-3, at 5.  A jury could conclude, based on the photographs in the record and Mr. Stoner's testimony that the drain was "not . . . maintained to acceptable standards," ECF No. 54-3, at 5, that WMATA failed to abide by its schedules, and that this in turn violated its duty.

### B.  Duty of Care—Common Carrier Versus Business Owner

The parties additionally dispute whether WMATA is subject to a heightened standard of care.  Under Maryland law, "[t]he liability of owners of real or personal property to an individual injured on their property is dependent on the standard of care owed to the individual and that in turn is contingent upon a determination of the individual's status while on the property."  *Hall v. WMATA*, 679 F. Supp. 2d 629, 632 (quoting *Bramble v. Thompson*, 287 A.2d 265, 267 (Md. 1972)).  Generally, a business owner owes an individual it invites onto its premises a "duty to use 'reasonable and ordinary care to keep [its] premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for [her] own safety, will not discover.'"  *Id.* (quoting *Bramble*, 287 A.2d at 267).  Common carriers like WMATA, however, owe passengers "the highest degree of care to provide safe means and methods

24

of transportation." *Id.* at 633 (quoting *Todd v. Mass Transit Admin*, 816 A.2d 930, 934 (Md. 2003)). Plaintiff argues the elevated duty of care applies to the parking garage.

"[A] common carrier is required to use the utmost degree of care and skill in everything that concerns the safety of passengers." *Kaplan v. Baltimore & O.R. Co.*, 113 A.2d 415, 416 (Md. 1955). This "duty is not limited to the actual transportation of passengers." *Id.* "The carrier is also required to provide safe means of access to the trains." *Id.* Nonetheless, the Maryland Supreme Court, in *Kaplan*, held that "the carrier is required to provide only such station facilities as are reasonably necessary for the accommodation of its passengers, actual and prospective." *Id.* at 416-17. Accordingly, "a carrier owes a duty to all persons coming to its stations, through its express or implied invitation, to exercise ordinary care to keep the station and the approaches thereto in a reasonably safe condition." *Id.* at 417.

More recent decisions from the Maryland Appellate Court have called this decision into question. In *Leatherwood Motor Coach Tours Corp. v. Nathan*, 579 A.2d 797 (Md. Ct. Spec. App. 2010), the plaintiff filed suit after she slipped on gravel as she attempted to board a bus at a bus stop. *Id.* at 799. The plaintiff's "injuries were sustained before she had actually boarded the bus, and were attributable to the condition of the surface of the shoulder of the road at the place of boarding, rather than to any defect in the bus itself or any act by the driver after he stopped to permit passengers to board." *Id.* Nonetheless, the trial court instructed the jury that:

> A common carrier of passengers, while not as an insurer of the safety of passengers, must employ the utmost care and diligence which human foresight can use. It is required to use the utmost degree of care, skill, and diligence in everything that concerns its passengers' transportation but is extended further and requires the carrier to provide a safe means to enter and exit the bus.

*Id.* On appeal, the court held that the trial court had properly instructed the jury, explaining:

> The relationship of carrier and passenger is not confined to the journey itself. It includes not only the duty to transport the passenger safely from one place to another but also, insofar as it is reasonably within the carrier's ability to do so, to provide safe ingress and egress. Therefore, the duty begins when a passenger who has paid his fare or a prospective passenger intending to do so starts to enter upon the conveyance or upon the carrier's station, platform, waiting room, or other facility maintained by the carrier for the passage and convenience of its passengers, and it ends when the passenger has safely exited the conveyance or the carrier's station, platform, or facility. In sum, the duration of the carrier's duty to the passenger is coextensive with the entire period of time the passenger can be said to be in its care.

*Id.* at 801. This Court, in reliance on this language, has held that Amtrak owes a heightened duty to not only passengers on its trains, but also on platforms at a train station. *Walker v. National R.R. Passenger Corp.*, 703 F. Supp. 2d 495, 501-02 (D. Md. 2010). *See also Hall v. WMATA*, 679 F. Supp. 2d 629, 633 (D. Md. 2010) (acknowledging, but not resolving the conflict between *Kaplan* and *Leatherwood*).

Ultimately, the court need not resolve this dispute presently. As discussed below, there are material disputes of fact as to whether WMATA had actual or constructive knowledge of the conditions at the drain, and whether they constituted an open and obvious danger, that prevent the Court from granting summary judgment to either party regardless of whether a heightened standard applies.

### C.    Actual or Constructive Knowledge

To establish negligence, Plaintiff must show either actual knowledge—that the Defendant definitively knew of the dangerous condition—or constructive knowledge, that "the condition existed for a length of time sufficient to permit a person under a duty to discover it if he had exercised ordinary care." *Rawls*, 113 A.2d at 409; *King*, 2016 WL 8716253, at *4 (explaining the sufficient length of time depends on the circumstances of the particular case).

Plaintiff has presented sufficient evidence to create a material dispute of fact as to whether WMATA had either actual or constructive knowledge of the muddy area in the parking garage. First, Defendant's cleaning schedules required that an employee check the grates on the afternoon of Plaintiff's accident.  ECF Nos. 50-1, 50-2.  Accordingly, had WMATA followed its own schedule, as Mr. Alexander claimed he did, it would have been aware of the grate's condition.  *See* ECF No. 46-8, at 2 (declaring that "during June 2021, [he] completed both [his] daily and weekly assigned tasks" and did not "recall deviating" from either schedule on the day in question.). Second, although Mr. Alexander testified that he did not recall any mud in the garage during May or June of 2021, he also acknowledged the grates would "clog[]" up when it rained."  ECF No. 44-19, at 24:3-6.  Third, the only inspection report Defendant produced is dated from May 2021, three weeks before the incident occurred.  ECF No. 51.  Even if the report concerns the North Garage— as opposed to the South Garage where the incident occurred, as WMATA claims, ECF No. 56-1, at 3—the report notes "Grates + Curbs need to be swe[pt] daily—dirty," which evidences a broader awareness of issues with drainage in the garages at the location.  ECF No. 51, at 2.  Finally, even if WMATA did not have actual knowledge of the condition, Mr. Stoner opines that, given the amount of mud surrounding the drain, the condition may have persisted for "quite some time," suggesting that WMATA should have been aware of the condition given its long pending nature. ECF No. 54-4, at 64:12-16.

"[I]n the face of conflicting evidence . . . summary judgment . . . is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility."  *U.S. EEOC v. Ecology Servs., Inc.* 447 F. Supp. 3d 420, 437 (D. Md. 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006)).  Accordingly, the parties raise a classic dispute of material fact because "when applied to the substantive law" these

facts "affect[] the outcome of the litigation." *Thomson v. Verizon MD, Inc.*, 140 F. Supp. 2d 546, 550 (D. Md. 2001) (citing *Anderson*, 477 U.S. at 248).

This case is distinguishable from this Court's decision on *Sullivan v. WMATA*, No. GLS-19-300, 2020 WL 917091 (D. Md. Feb. 26, 2020), on which Defendant relies. In *Sullivan*, this Court granted summary judgment to defendant WMATA where a plaintiff slipped and fell on a wet train platform as he attempted to board a subway car. *Id.* at *1, 6. The plaintiff in that case failed to produce any evidence supporting the conclusion that WMATA had either actual or constructive notice of the slippery conditions on the platform. *Id.* at *3-5. With respect to actual notice, there was "no testimony from any WMATA employee that he/she observed the condition of the platform." *Id.* at *3. As to constructive notice, the record lacked any evidence "of when the allegedly slippery condition arose." *Id.* at *5. Lacking any factual basis for the emergence of the slippery conditions, the Court granted summary judgment to the defendant. This case differs because, as described above, Plaintiff has presented evidence raising a dispute of material fact as to Defendant's knowledge.[8]

Finally, Defendant's argument that Plaintiff "failed to develop evidence that WMATA had notice of the mud" belies the procedural history of this case. ECF No. 46-1, at 11. Plaintiff attempted to obtain inspection reports throughout discovery. Defendant, however, failed to produce the reports, despite testimony from supervisors that the documents existed. ECF No. 32, at 1; ECF No. 44-21, at 9:15-12:10, 16:13-18:4. Additionally, the one inspection report Defendant did produce—though dated from May 2021 and allegedly covering the North Garage—noted that

---

[8] Contrary to Defendant's suggestion, there is no requirement that Plaintiff submit evidence indicating Defendant "previously received complaints or findings of the alleged unsafe condition." ECF No. 56-1, at 7. While this is one form of evidence supporting a finding that WMATA had actual notice of the condition, it is not the only acceptable type. Plaintiff, likewise, may succeed by presenting evidence of constructive notice.

the grates in the garage were dirty, ECF No. 51, at 2, indicating a broader awareness of the subpar cleanliness of the grates in the garages at the Shady Grove location.

### D.    Open and Obvious Condition

Defendant additionally argues that it is entitled to summary judgment on account of the open and obvious nature of the mud on which Plaintiff slipped.  "An owner owes a duty to an invitee to warn of known hidden dangers, not open or obvious ones."  *Ramseur v. United States*, 587 F. Supp. 2d 672, 684 (D. Md. 2007).  "[T]herefore, an invitee harmed by an open and obvious condition is ordinarily not entitled to any recovery for h[er] injuries."  *Grant v. United States*, No. AW-10-69, 2011 WL 2175205, at *3 (D. Md. June 1, 2011).

"An open and obvious condition is one that is apparent and recognizable to 'a reasonable person in the position of a visitor, exercising ordinary perception, intelligence, and judgment.'"  *Duncan-Bogley v. United States*, 356 F. Supp. 3d 529, 540 (D. Md. 2018) (quoting *Coleman v. United States*, 369 F. App'x 459, 462 (4th Cir. 2010)).  "Whether a defect is open and obvious is typically a question reserved for the factfinder."  *Id.* (citing *C & M Builders, LLC v. Strub*, 22 A.3d 867, 885 (Md. 2011)).  "There is no exact test for determining whether a dangerous condition is so obvious that a person of ordinary prudence would see it and avoid it."  *Grant*, 2011 WL 2175205, at *3.  Rather, the issue turns on the facts of each specific case.  *Id.*  Examples of open and obvious conditions include a bolt protruding two inches above a floor, a significant, sizeable crack in the pavement of a parking lot, or a perforated mat in a business setting.  *Finkelstein v. Vulcan Paint & Const. Co.*, 168 A.2d 393, 394-95 (Md. 1961); *Gellerman v. Shawan Rd. Hotel Ltd. P'ship*, 5 F. Supp. 2d 351, 353-54 (D. Md. 1998); *Ramseur*, 587 F. Supp. 2d at 684.

Plaintiff has presented sufficient evidence to establish a material dispute of fact as to whether the mud on which she slipped was open and obvious.  Plaintiff testified that she did not

see the muddy area, which was dark in color, until she slipped on it.  ECF No. 46-4, at 24:13-19.

The photos and videos from the day of the incident support her recollection, displaying a muddy,

silty substance similar in color to the garage floor.  ECF Nos. 44-4, 44-5, 53.  Conversely, the

Officer's body-worn camera footage from the day of the incident evidences that at the time of the

incident the garage was well-lit.  Additionally, photographs show mud overlapping with yellow

markings on the garage floor, suggesting that a jury may find that the mud could have been easy

to spot.  ECF Nos. 44-4, 44-5, 53.  Accordingly, the Court will deny each party's respective

affirmative Motion for Summary Judgment on this point.

## IV.    Spoliation Sanctions

Finally, Plaintiff argues that Defendant's failure to preserve inspection reports from the

parking garage constitutes spoliation.  ECF No. 62, at 5.  Accordingly, she requests that the Court

grant her Motion and deny Defendant's Motion as a sanction.  *Id.* at 5-8.  Although the Court

declines to adopt such an extreme sanction, it reserves ruling on whether a narrower sanction may

be appropriate.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  A party seeking sanctions

for spoliation must show

(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Membreno v. Atl. Rest. Partners, LLC*, 338 F.R.D. 66, 71 (D. Md. 2021) (quoting *Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC*, 908 F. Supp. 2d 673, 678 (D. Md. 2012)).  At this stage, Plaintiff establishes the first and third elements, but cannot meet her burden on the second.

"The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591.  Plaintiff contacted Defendant within one week of the accident to inform it of her injury.  ECF No. 44-26.  At that point, WMATA should have anticipated litigation and, thus, "ensure[d] that potentially relevant evidence under its control [was] identified, located, and preserved."  *Moore v. WMATA*, No. TJS-24-2891, 2025 WL 1556069, at *3 (May 30, 2025); *see also id.* at *4 ("WMATA reasonably should have known that the video footage may be relevant to anticipated litigation as a result of [plaintiff]'s fall and injury while on" a WMATA bus).

Compounding matters, the evidence WMATA has failed to produce is highly relevant to the case.  "[L]ost or destroyed evidence is relevant if 'a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.'"  *Id.* at *4 (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 531 (D. Md. 2010)).  The inspection reports—particularly those from the day of the accident—are central to the disputes of fact relevant to the application of sovereign immunity and Defendant's knowledge of the danger that caused Plaintiff harm.

Plaintiff, however, has failed to establish that WMATA acted with the necessary state of mind to impose the sanction it requests.  "[T]he spoliator 'must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction'—mere 'negligent loss or destruction of evidence' is not

enough." *Nat'l Fair Housing Alliance v. Bank of Am., N.A.*, No. SAG-18-1919, 2023 WL 4669560, at *4 (D. Md. Jan. 23, 2023) (quoting *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013)).  Plaintiff provides no argument regarding Defendant's state of mind, and the record does not contain evidence suggesting intent to destroy or lose the inspection reports.  ECF No. 62, at 5-8.

Although Plaintiff has not established each element of spoliation, the Court is troubled by Defendant's conduct.  For that reason, as previously discussed, the Court will reserve ruling on the appropriateness of an adverse inference as to Defendant's knowledge of the muddy conditions which caused Plaintiff's fall.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment, ECF No. 46; and Plaintiff's Motion for Partial Summary Judgment, ECF No. 44, are denied.  Defendant's Motion to Exclude Expert Testimony, ECF No. 45, is granted, in part, and denied, in part.  Within fourteen days, the parties shall provide a Joint Status Report addressing their position on referral to a U.S. Magistrate Judge of this Court for a settlement conference.

So ordered.

Dated: September 16, 2025                           _____/s/_____
                                                    Ajmel A. Quereshi
                                                    United States Magistrate Judge